Hamachek, Appellant, vs. Hamachek, Respondent.

*May 3—June 1, 1955.*

196

For the appellant there was a brief by *Everson, Ryan, Whitney & O'Melia* of Green Bay, and oral argument by *John C. Whitney.*

For the respondent there was a brief by *Welsh, Trowbridge, Wilmer & Bills* of Green Bay, and oral argument by *Fred N. Trowbridge.*

FAIRCHILD, C. J. In its order of December 17, 1954, the trial court found that Marjorie Hamachek was not a fit person to have custody of her son, David Francis Hamachek. Appellant claims (1) that the order was punitive in nature and that the court made no finding concerning and did not consider the welfare of the child; (2) that the court made no finding as to the fitness of the father, Ogden Hamachek; and (3) that the court based its finding on a single moral lapse on the part of Marjorie Hamachek, and that a sole moral transgression is not sufficient to warrant the court in its finding where such transgression has not affected the welfare of the child.

The welfare of the child is, of course, the prime consideration of a court in granting or changing the custody of any child. *Acheson v. Acheson,* 235 Wis. 610, 294 N. W. 6. The law involved here is that whenever the welfare of any child will be promoted thereby, the court granting the decree of divorce "shall always have the power to change the care and custody of any such child, either by giving it to or taking it from such parent or other person or such institution, provided that no order changing the custody of any child shall be entered until after notice of such application shall have been given." Sec. 247.24, Stats. When a court finds, as it did here, that a parent is unfit to have custody of a child, it implicitly follows that changing such custody from such parent is for the welfare of the child.

Courts have no power in awarding custody of minor children other than that provided by statute. The only provision

in the statutes for awarding custody of minor children to an institution or to a person other than the parents is that which is applicable to cases where both the mother and father are found unfit to have custody. In *Vogel v. Vogel,* 259 Wis. 373, 375, 48 N. W. (2d) 501, it was held that:

"When the wife is proven to be morally unfit to have the custody of the minor children of a married couple and there is no testimony that the father is incompetent, unfit, or unworthy to have the care and custody of the children, their care and custody should be awarded to him if he can provide for them a suitable home with competent and proper supervision in his absence."

There is no substantial, convincing evidence in the record to show that Ogden Hamachek is "incompetent, unfit, or unworthy" to have the custody of his son, David. On the contrary, the testimony shows that he has a good home, is financially well able to provide for his son, that he lives with his mother, who is in good health and is at home most of the time, and that she and her son are able to provide proper supervision for the boy.

Although Mrs. Hamachek admitted to only one incident of illicit relations with Salo, which occurred in October, 1952, and resulted in the birth of their child, the court was not confined to the consideration of that one admission in reaching the conclusion it did in finding her an unfit person to have custody of David. The court was obliged to take into account the entire testimony, with its flaws and weaknesses, and to draw from that testimony conclusions as to the true situation.

The depositions and testimony on trial reveal a close and continued association between Elmer Salo and Mrs. Hamachek from the time she met him at the party in June, 1952, until August, 1953. From June to August, 1952, up until the time he left for Japan they saw each other three or four nights a week. Mrs. Hamachek testified that in August Salo

"continually told me he loved me and wanted to marry me." She suggested waiting. When he returned from Japan, on October 23, 1952, the intimate relation to which she admitted occurred. When she suspected that she was pregnant, she wrote to Salo and called him on the phone. At the time she left to go to St. Petersburg, Florida, in February, 1953, because of her condition, Salo sent her the fare. When Salo learned that he was to be stationed in Charleston in November, 1952, he told Mrs. Hamachek that he would send for her as soon as he got settled, but his wife was with him in Charleston at that time and until March, 1953. As soon as Mrs. Salo went back to California, Mrs. Hamachek went to Charleston. Mr. Salo paid for her living expenses there. He testified that he spent "all of his spare time with her and David." They went out socially together, and he introduced her as his cousin. After the birth of their baby in July, 1953, Mrs. Hamachek went back to Massachusetts, because Mr. Hamachek was due to come East at that time to get David for his summer visit.

It is claimed by appellant that she did not know Salo was a married man until shortly after the incident of October 23, 1952. However, it is undisputed that from November, 1952, Mrs. Hamachek was aware of his marital status. She knew that he was having difficulty in getting a divorce. Although she professed many times after she learned that he was married that she did not want to see him again, she did see him and continued to see him even after she had returned home subsequent to the birth of the baby. Salo admitted he saw her the day before Thanksgiving in 1953 and that there was correspondence up to December 28, 1953. He also testified that he sent her a Valentine's Day card in February, 1954, and that he saw her in April, 1954, and again in July, 1954. "About seven days altogether were included in those two visits." Between April and July he was on board ship. Marjorie Hamachek knew the risk she was taking concerning

the custody of David, as Salo testified that she told him that she did not want to see him because she did not want to jeopardize David's future by keeping company with a married man. She told him that he had no right to see her. In spite of those professions, she did see him again and again right up until July of 1954.

When the testimony is sifted out and the many contradictory statements of Salo and Mrs. Hamachek are weighed, an inference that they had not made a true and frank disclosure of their relationship could be reasonably drawn. The trial court could well have inferred from the testimony that the single instance of illicit relations admitted to was not the only act of intimacy.

As has been said, it is the child's welfare with which the court must concern itself. In placing the responsibility of custody of the child upon one or the other parent, the court must give consideration to essential and readily recognized facts in reaching a conclusion as to what is for the welfare of the child. The interest of the unfortunate victim in the drama—the child—is of course the controlling factor. The hurt suffered by the parent to whom custody is denied is too often at the front of the stage. Although the mother's love and ability to care for the child should be considered, where it is coupled with thoughtlessness of proprieties, and at times indifference to standards of acceptable relationship between the sexes—even though such indifference cannot be said to have reached the degree of depravity—the importance of the natural love and affection of a mother may be outweighed by other elements. In dealing with this serious and delicate question, the character and tendencies of the parents are to be studied. The influence capable of inspiring wholesome ideals and purposes in a growing child is not completely encompassed in the relationship of mother and child.

In this instance, although the controlling consideration was the misconduct of the mother, the court was also war-

ranted in comparing the advantages afforded the child by the respective homes of the mother and father. Unsettled circumstances and complications of an unusual nature may warrant the conclusion of the unfitness of one parent as against the other. The father is able to offer a suitable and proper home for the child, with advantages for its future rearing and education beyond the mother's ability to offer. Mrs. Hamachek must support herself, and her earning capacity is limited by lack of special qualifications or training for employment. The testimony shows that she is also inclined to spend money freely.

When the matter of custody is properly called in question, the trial court is vested with discretionary power with respect to changing custody, and an award will not be disturbed on appeal unless there is a clear abuse of such discretion. This of course means that the ruling as to the custody will not be disturbed unless it is clearly against the weight of the evidence. 27 C. J. S., Divorce, p. 1263, sec. 324 (5). See also *Acheson v. Acheson,* 235 Wis. 610, 613, 294 N. W. 6. We cannot hold that the court's order in the instant case was clearly against the weight of the evidence.

The suggestion, that the court acted hastily in coming to the conclusion it did, overlooks the many things that have transpired in the development of the tragedy which now confronts these parties and their child. The order, as set forth in the foregoing statement of facts, included rights of visitation.

"As has been repeatedly held by this court, the matter of the custody of children in divorce actions is a matter peculiarly within the jurisdiction of the trial court, who has seen the parties, had an opportunity to observe their conduct, and is in much better position to determine where the best interests of the child lie than is an appellate court." *Adams v. Adams,* 178 Wis. 522, 525, 190 N. W. 359.

We are of the opinion that the order, together with the reservation concerning rights of visitation, must be upheld.

*By the Court.*—Order affirmed, cause remanded to the trial court for further and proper proceedings.