IN RE the PATERNITY OF STEPHANIE R. N.: ANDREW J. N., Petitioner-Respondent-Petitioner,†

v.

WENDY L. D., Respondent-Appellant.

Supreme Court

*No. 90–1604. Oral argument January 6, 1993.—Decided April 20, 1993.*

(Also reported in 498 N.W.2d 235.)

†Motion for reconsideration denied.

745

746

747

748

750

751

For the petitioner-respondent-petitioner there was a brief by *George K. Steil, Jr., Margery M. Tibbetts* and *Brennan, Steil, Basting & MacDougall, S.C.*, Janesville and oral argument by *George K. Steil, Jr.* and Guardian ad Litem *Tod O. Daniel*, Janesville.

For the respondent-appellant there was a brief by *James T. Conway*, Janesville and oral argument by pro-se *Wendy L. Dyson*, Madison.

STEINMETZ, J. This is a review of a published decision of the court of appeals, *In re Paternity of S.R.N.*, 167 Wis. 2d 315, 481 N.W.2d 672 (Ct. App. 1992), reversing a judgment of the Rock County circuit court, Judge John H. Lussow. There is only one issue presented in this case: whether sec. 767.325(1)(a), Stats.,[1] permits a trial court to substantially modify within two years an intial legal custody and physical

---

[1] Section 767.325(1)(a), Stats., provides as follows:

**767.325 Revision of legal custody and physical placement orders.** Except for matters under s. 767.327 or 767.329, the following provisions are applicable to modifications of legal custody and physical placement orders:

(1) Substantial modifications. (a) Within 2 years after initial order. Except as provided under sub. (2), a court may not modify any of the following orders before 2 years after the initial order is entered under s. 767.24, unless a party seeking the modification, upon petition, motion, or order to show cause shows by substantial evidence that the modification is necessary because the current custodial conditions are physically or emotionally harmful to the best interest of the child:

1. An order of legal custody.

placement award granted to the custodial parent (the child's mother) on August 9, 1988, under the following circumstances:

(1) The custodial parent unreasonably and continuously interfered with the noncustodial parent's visitation rights.

(2) In the opinion of a psychologist and a social worker, granting placement and custody to the noncustodial parent would be in the child's best interest.

(3) Pending the modification hearing, the trial court issued a temporary order granting primary placement of the child to the noncustodial parent. The order granted alternate weekend visitation to the custodial parent. After returning from these weekend visits, the approximately two-year-old child exhibited "acting out behaviors."

(4) There was testimony presented that upon leaving the custodial parent's care, the child was developmentally behind with respect to her verbal skills, "social emotional" development, gross motor skills, and fine motor skills.

We conclude that sec. 767.325(1)(a), Stats., does not permit substantial modification of an initial legal custody and physical placement award under these circumstances. The court of appeals is affirmed.

Stephanie R. N. was born on July 4, 1987, to Wendy L. D. ("Wendy"). On April 20, 1988, Andrew J. N. ("Andrew") was adjudicated Stephanie's father in Rock county circuit court, Judge John H. Lussow.

On August 9, 1988, pursuant to Wendy's motion, the trial court issued an oral order granting Wendy sole legal

2. An order of physical placement if the modification would substantially alter the time a parent may spend with his or her child.

755

custody and primary physical placement[2] of Stephanie. Andrew was granted alternate weekend and holiday visitation.[3] A written order to this effect was issued on December 6, 1988.

On December 21, 1988, Andrew filed a motion requesting the court to find Wendy in contempt of the August 9 order for denying his visitation rights. A hearing was held on January 4 and 6, 1989. At the hearing, Andrew alleged that Wendy unjustifiably refused to allow his court-ordered visitation for four consecutive weekends,[4] Christmas Eve, and a full week during his semester break from college. Wendy claimed that she justifiably denied Andrew's visitation because the child was ill. The trial court concluded that Wendy had no rational basis for these denials and found Wendy in contempt of the August 9 order. As a remedial measure, the court awarded additional visitation to the father to compensate for Wendy's past denials. In addition, the court appointed Attorney Tod O. Daniel as the child's guardian ad litem. The judge signed a written order stemming from these proceedings *nunc pro tunc* on February 16, 1989.

On February 2, 1989, the guardian ad litem filed another motion requesting that Wendy be held in con-

---

[2] "Legal custody" and "sole legal custody" are defined in sec. 767.001(2) and (6), Stats., 1991–92. The term "custody" as used in this opinion refers to "legal custody."

"Physical placement" is defined in sec. 767.001(5), Stats., 1991–92. The term "placement" as used in this opinion refers to "physical placement."

[3] The term "visitation" as used in this opinion refers to short periods of physical placement, *i.e.*, weekends and holidays.

[4] The weekends in question are as follows: October 7–9, 1988, October 21–23, 1988, November 4–6, 1988, and November 18–20, 1988.

tempt for failure to comply with the trial court's January 6, 1989, visitation order. The motion also requested that Andrew be granted temporary physical placement of Stephanie pending a full custody hearing.

On February 16, 1989, a hearing was held on this motion, at which time the guardian ad litem alleged that Wendy unjustifiably refused to allow Andrew's court-ordered visitation for the weekends of January 27, and February 10, 1989. Wendy again claimed that she denied visitation on those weekends because the child was sick. To rebut Wendy's defense, the guardian ad litem testified that Stephanie's doctor assured him that there was no medical reason for denying visitation. In addition, the guardian ad litem submitted Stephanie's medical records into evidence. In those records, the child' pediatrician indicated that through January 19, 1989, Stephanie was in excellent health, physically and intellectually. By order of February 17, 1989, the trial court granted the guardian ad litem's motion, and Andrew was awarded temporary custody of Stephanie.

Wendy refused to transfer Stephanie to Andrew pursuant to the temporary order. On February 20, 1989, a Rock county sheriff forcibly entered Wendy's residence and retrieved Stephanie. On March 3, 1989, the trial court found Wendy in contempt for refusing to comply with the temporary order. The trial court later ordered psychological testing of all persons relevant to the final determination of custody.

On October 10, 1989, at the mother's reconsideration motion hearing, the trial court stated:

> I have ordered the parties to be interviewed by the counseling service and they are to make recommendations to the court, and then we would have a hearing on that, and the court would determine the fitness of the parties respectively and what's *in the*

757

*best interests of the child,* award custody to one party or the other, and set up a visitation schedule, and that's it. (Emphasis added.)

On December 12 and 13, 1989, and March 19, 1990, the final custody hearing was held. The trial court concluded that modification of the initial custody and placement order was warranted. The court granted sole legal custody and primary physical placement to the father. Wendy was allowed periods of physical placement only if they were supervised by the department of social services.

When making this decision, the trial court considered several factors.[5] First, the court considered Wendy's unreasonable interference with Andrew's visitation rights. As explained above, Wendy denied Andrew his court-ordered visitation on Christmas Eve, during Andrew's semester break, and on several weekends. The record indicates that when Wendy denied Andrew his weekend visitation, she only refused to let Andrew take Stephanie out of the house. Wendy invited Andrew into her house to spend time with Stephanie. On some of these weekends, Andrew entered Wendy's home to check on Stephanie, but he did not stay for an appreciable amount of time.

Second, the trial court considered Wendy and Andrew's mental health. Two experts, a psychologist and a social worker,[6] testified for the guardian ad litem.

---

[5] As explained in more detail below, the trial court conducted the final custody hearing under a mistaken view of the law. As a result, the court based its decision to modify custody and placement on factors which were clearly irrelevant. Only the factors that could reasonably be considered relevant to the correct legal standard are discussed here.

[6] The psychologist, Dr. Richard James Schlaefer, interviewed Wendy and prepared a written report. The social worker, Anita

They concluded that it would be in Stephanie's best interest to reside with Andrew. They reasoned that Andrew and his fiancee were functional, stable people, but that Wendy was a dysfunctional, unstable person. Wendy's dysfunction could cause Stephanie to become frightened, insecure, and unstable. It could also cause the child to display antisocial behavior such as hitting other children, throwing tantrums, and in general acting unruly. Moreover, said dysfunction could slow Stephanie's development.

Third, the trial court considered the fact that Stephanie was developmentally behind upon leaving her mother's care. Kristine Hanson testified for the guardian ad litem. Hanson was Stephanie's day-care provider from February, 1989, when Stephanie was temporarily transferred to Andrew's care, through August of that same year. Hanson indicated that upon entering day care Stephanie was developmentally behind with respect to her verbal skills, social emotional development (*i.e.*, excessive crying, tantrums, etc.), gross motor skills (*i.e.*, walking on different terrains), and fine motor skills (*i.e.*, grasping with her hands).

Hanson was qualified to make these determinations, because she holds a B.S. degree in education from the University of Minnesota, is certified by the state of Wisconsin as a child care provider, and has five years of experience in the child care field.

Finally, the trial court heard evidence that Stephanie became unruly after her weekend visits with Wendy. These visits were provided for in the February 17 temporary order. Kristine Hanson testified that on the Monday and Tuesday after Stephanie returned from weekends with her mother, Stephanie's behavior became

Kropf, did not interview Wendy. Kropf based her testimony solely on Dr. Schlaefer's findings.

extremely aggressive. She would attack other children without provocation, biting, kicking, and punching, until she was physically restrained. Her behavior would improve over the next two weeks until on the Friday before she visited her mother, Stephanie was cooperative and "wonderful" to have around. After visitation with her mother, this behavioral cycle would start over again. These incidents became so frequent and severe that Stephanie had to be dismissed from Hanson's day-care program.

Because the guardian ad litem sought modification of custody and placement within two years of the initial order, sec. 767.325(1)(a), Stats., is controlling. That section states as follows:

> [A] court may not modify . . . [an order of legal custody or physical placement] *before 2 years* after the initial order is entered under s. 767.24, unless a party seeking the modification, upon petition, motion, or order to show cause shows by substantial evidence that the modification is necessary because the current custodial conditions are physically or emotionally harmful to the best interest of the child . . . (Emphasis added.)

Section 767.325(1)(a), Stats., contains four elements: (1) substantial evidence, (2) that the modification is necessary, (3) because the current custodial conditions, (4) are physically or emotionally harmful to the best interest of the child. "Substantial evidence" refers to evidence which is " 'considerable in amount, value or worth.' " *Corcoran v. Corcoran,* 109 Wis. 2d 36, 43, 324 N.W.2d 901 (Ct. App. 1982).

"Necessary" embodies at least two concepts. First, the modification must operate to protect the child from the alleged harmful "custodial conditions." Second, the physical or emotional harm threatened by the "current custodial conditions" must be severe enough to warrant modification. *See In re Marriage of Millikin v. Millikin*, 115 Wis. 2d 16, 23, 339 N.W.2d 573 (1983).

The level of severity needed to make modification "necessary" cannot be defined with precision. The "necessary" standard requires more than a showing that the proposed modification is in the child's best interest. For example, merely showing that the "custodial parent cannot match the better general living conditions offered by the parent seeking change of" legal custody and physical placement will not suffice. *Id.* at 23–24. However, the standard does not require a showing that the modification is essential. For example, the moving party need not prove "that the child [is] in impending or immediate danger of life, health, or safety." *Id.* at 23. The "current custodial conditions" element refers to the food, shelter, and care provided to the child by the custodial parent in accord with the initial custody and physical placement order.[7]

To prove the final element, "physical or emotional harm to the child's best interest," the moving party must show that the "current custodial conditions" threaten emotional or physical harm to the child. There is generally no need to prove that the child has actually suffered

---

[7] This court expresses no opinion on the court of appeals' assertion that " 'current custodial conditions' has the same meaning as 'present environment,' " in sec. 409(a) of the Uniform Marriage and Divorce Act. *S.R.N.*, 167 Wis. 2d at 338.

harm. Obviously, if a child is kept in squalid and unsanitary conditions, a concerned parent is not required to wait until the child becomes sick before seeking a modification. It must be kept in mind, however, that the physical or emotional harm element is intertwined with the "necessary" element. The severity of harm threatened by the "current custodial conditions" must be high enough so that modification is "necessary."

We disagree with the court of appeals' statement that "[e]vidence of conditions which existed and events which occurred" after a child is removed from its "current custodial conditions" are irrelevant to the issue of whether the said custodial conditions were harmful. *S.R.N.*, 167 Wis. 2d at 338. Such evidence is relevant only if it bears upon the quality of food, shelter, or care, that the child had been receiving under the initial order. For example, as explained below, the fact that Stephanie was developmentally behind after leaving her mother's care is probative of the quality of care that she had been receiving under the initial order.

The guardian ad litem argues that sec. 767.325(1)(a), Stats., does not apply to a temporary modification of custody and placement pending a full custody hearing. We disagree. The language of sec. 767.325(1)(a), does not distinguish between permanent and temporary modification orders. Accordingly, we conclude that the section applies to both types of orders.

The guardian ad litem also argues that when deciding a motion under sec. 767.325(1)(a), Stats., the trial court must apply the factors set forth in sec. 767.24(5). We disagree. The legislative history of sec. 767.325(1)(a) evinces a contrary intent. Section 767.325(1)(a) replaced

sec. 767.32(2) (1985–86); Act of April 22, 1988, sec. 44, 46, ch. 355, 1987 Wis. Laws 1259, 1273; which provided as follows:

> Any modification of a custody order which removes a child from the care of a parent having custody of the child shall be based on a finding that such removal is necessary to the child's best interest as shown by substantial evidence supporting a change in custody under s. 767.24(2) [now sec. 767.24(5)].

The language of sec. 767.32(2) expressly required the trial court to consider the sec. 767.24(5) factors. The legislature deleted this requirement when it enacted sec. 767.325(1)(a), revealing its intent to eliminate the requirement. Accordingly, under the current law, a trial court may consider the sec. 767.24(5) factors when deciding a sec. 767.325(1)(a) modification motion only if said factors are relevant to the "necessary" standard.

In addition, close examination of sec. 767.325, Stats., reveals a legislative intent to discourage modification of custody and physical placement awards within two years of their initial issue. The standard of sec. 767.325(1)(a), which applies for two years after an initial order, is much higher than the standard of sec. 767.325(1)(b), a general best interests standard, which applies to modifications made after the initial order has been in force for two years.

> The legislature's omission of a general best interest standard from sec. 767.325(1)(a), Stats., evinces its intent that after the circuit court's initial determination of legal custody and physical placement, there shall be a two-year period of finality during which legal custody and physical placement may not be substantially modified, unless necessary because custo-

763

dial conditions are physically or emotionally harmful to the child's best interest.

*S.R.N.*, 167 Wis. 2d at 330.

We agree with the court of appeals' conclusion that "the legislative history of sec. 767.325(1)(a), Stats., and its predecessor, sec. 767.32(2), Stats., shows that the legislature intended to provide a 'time-out' or 'truce' period of two years during which the child and the parents can adjust to the new family situation." *S.R.N.*, 167 Wis. 2d at 332–33.[8] "[I]n [this] two-year period of finality and stability, the courts are not to be battlefields where wounded parents turn their children as weapons against one another. The reasons for judicial intervention in the established custodial arrangement during the two-year truce must be compelling." *Id.* at 343.

We conclude that the decision to modify custody and placement under sec. 767.325(1)(a), Stats., is within the trial court's discretion. It will not be disturbed unless the trial court erroneously exercises that discretion.

Our conclusion follows over 50 years of Wisconsin precedent. Prior to 1977, modification of child custody orders was governed by sec. 247.25 and sec. 247.24(2), Stats., 1975. Section 247.24(2) stated in relevant part as follows:

Whenever the welfare of any such child will be promoted thereby, the court granting such judgment shall always have the power to change the care and custody of any such child, either by giving it to taking it from such parent, relative or agency . . ..

---

[8] For a full and detailed recitation of the legislative history of sec. 767.325(1)(a), Stats., *see* the court of appeals opinion, *S.R.N.*, 167 Wis. 2d at 325–32.

Section 247.25 stated in relevant part as follows:

> The court may from time to time . . ., on the petition of either of the parties and upon notice to the family court commissioner, revise and alter such judgment concerning the care, custody, maintenance and education of any of the children, and make a new judgment concerning the same as the circumstances of the parents and the benefit of the children shall require.

When reviewing modifications under these statutes, appellate courts applied the erroneous exercise of discretion standard of review. *See, e.g., Acheson v. Acheson,* 235 Wis. 610, 613, 294 N.W. 6 (1940); *Hamachek v. Hamachek,* 270 Wis. 194, 202, 70 N.W.2d 595 (1955); *State ex rel. Hannon v. Eisler,* 270 Wis. 469, 479–80, 71 N.W.2d 376 (1955); *Anderson v. Anderson,* 8 Wis. 2d 133, 142–43, 98 N.W.2d 434 (1959). Custody modifications were considered "peculiarly within the jurisdiction of the trial court, who has seen the parties, had an opportunity to observe their conduct, and is in much better position to determine where the best interests of the child lie than is an appellate court." *Hamachek,* 270 Wis. at 202 (quoting *Adams v. Adams,* 178 Wis. 522, 525, 190 N.W. 359 (1922)).

In 1977, sec. 247.25 and sec. 247.24(2), Stats., were repealed and sec. 767.32(2), quoted above, was created to take their place. Act of October 15, 1977, secs. 38, 40, ch. 105, 1977 Wis. Laws 560, 570 (codified at sec. 247.32(2) (1977) and renumbered to sec. 767.32(2) by the Act of July 19, 1979 sec. 50 ch. 32, 1979 Wis. Laws 46, 50). Although the standard for modification under sec. 767.32(2) was more burdensome and more structured than it was under sec. 247.25 and sec. 247.24(2), *see Millikin,* 115 Wis. 2d at 23, the erroneous exercise of

discretion standard of review was retained. *See, e.g., In re Marriage of Groh v. Groh,* 110 Wis. 2d 117, 128, 327 N.W.2d 655 (1983); *In re Marriage of Gould v. Gould,* 116 Wis. 2d 493, 497–98, 342 N.W.2d 426 (1984); *Millikin,* 115 Wis. 2d at 35.

Section 767.325(1)(a), Stats., replaced sec. 767.32(2) in 1988. Although the standard for modification in sec. 767.325(1)(a) is more structured than it was under sec. 767.32(2), we conclude that the rationale stated in *Hamachek* is still applicable. The trial court is in a much better position to determine whether or not "modification is necessary because the current custodial conditions are physically or emotionally harmful to the best interest of the child." Section 767.325(1)(a), Stats.

"We review a discretionary decision only to determine whether the trial court examined the facts of record, applied a proper legal standard, and, using a rational process, reached a reasonable conclusion." *State v. Hamm,* 146 Wis. 2d 130, 145, 430 N.W.2d 584 (Ct. App. 1988). This court will not reverse unless there is no reasonable basis for the trial court's exercise of discretion. *Groh,* 110 Wis. 2d at 128.

A review of the record in this case reveals that the trial court applied sec. 767.325(1)(a), Stats., incorrectly.[9] It found, contrary to our interpretation above, that sec. 767.325(1)(a) required it to consider all of the factors listed in sec. 767.24(5). As a result, the court erroneously focused on the "best interest of the child standard" in sec. 767.24(5) rather than the "necessary to modify" standard in sec. 767.325(1)(a). The issue before the court

---

[9] This conclusion is based on statements and findings in the trial court record. The court of appeals recites some of these statements and findings. *S.R.N.,* 167 Wis. 2d at 336–38.

when custody was transferred from the mother to the father was not which parent would be the better caretaker. That had been decided by the trial court when custody was originally given to the mother. In addition, the court's conclusion to modify custody and placement was based on several factors which were relevant to the "best interest standard" but not relevant to the "necessary standard."

Although the trial court's exercise of discretion demonstrates consideration of improper factors and a mistaken view of the law, we will not reverse if facts of record applied to the proper legal standard support the trial court's conclusion. *State v. Johnson*, 118 Wis. 2d 472, 480–81, 348 N.W.2d 196 (Ct. App. 1984) (consideration of improper facts); *State v. Sorenson*, 143 Wis. 2d 226, 250, 421 N.W.2d 77 (1988) (misapplication of law); *see also State v. Selders*, 163 Wis. 2d 607, 617, 472 N.W.2d 526 (Ct. App. 1991).

The trial court's temporary transfer of custody was clearly an erroneous exercise of discretion. The guardian ad litem produced no evidence suggesting that modification of custody and placement with the mother was "necessary." In fact, the guardian ad litem's proof (his discussion with the child's doctor and the child's medical records) indicates that the child was thriving, physically and intellectually, in her mother's care.

In its initial December 6, 1988, custody and placement order, the trial court found: "[i]t was in the present best interest of [the child] that the [mother] shall have sole legal custody of the minor child." No substantial evidence of changed circumstances was presented at the temporary or final custody and placement hearing which would warrant a contrary conclusion, except for the

mother's interference with physical placement of the child with the father. This evidence was irrelevant because the guardian ad litem failed to show that said interference was physically or emotionally harmful to the child.

The trial court's permanent transfer of custody was also an erroneous exercise of discretion. There are no facts of record which provide a reasonable basis for the trial court to conclude that modification was "necessary."

The mother's interference with the father's visitation rights, by itself, is not relevant to the sec. 767.325(1)(a), Stats., standard. This fact would have been relevant if the guardian ad litem had shown that the interference was physically or emotionally harmful to the child; however, the guardian ad litem failed to make such a showing.

Certainly, denying a child the right to visit a parent *may* be emotionally harmful to that child. However, this fact does not make proof that visitation rights were denied relevant to the "necessary to modify" standard. Whether and to what degree denial of visitation affects the emotional well-being of a particular child is not common knowledge. For example, how long must visitation be denied before it causes or threatens emotional harm to a child? Is one weekend enough? Are two weekends enough? How does a child's age affect this determination? Does denial of visitation affect a one-year-old, more or less than a five-year-old, a ten-year-old, etc.? How does the relationship between the child and the parents affect this determination? In this case, when the mother denied visitation to the father, she only refused to let the father take the child out of the house. The

mother invited the father into her home to spend time with the child. The father refused to visit the child in the mother's home. Thus, the mother did not completely isolate the child from the father. How does this affect the emotional harm determination?

Moreover, at what point does the harm or threat of harm caused by denial of visitation make modification "necessary?" As explained above, the sec. 767.325(1)(a), Stats., standard requires "necessity," which suggests some immediate need for modification. "Necessity" also requires more than a showing that modification is in the child's best interests. The fact that denial of visitation *may* cause emotional harm to a child does not indicate when modification becomes "necessary."

The evidence concerning the mental health of the mother and father is also not relevant to the sec. 767.325(1)(a), Stats., standard. This is so because the experts, Dr. Schlaefer and Anita Kropf, applied an inapplicable standard when conducting their evaluations: the "best interests of the child standard" rather than the "necessary to modify" standard. The expert's opinion that Wendy's dysfunction "*could*" cause emotional harm to Stephanie, although relevant to the best interests standard, is much too speculative to assist the trial court in determining whether modification is "necessary."

The testimony concerning Stephanie's retarded development is relevant evidence. The mother was the child's primary caretaker from birth until the temporary transfer. The child's lack of development, which was noticed after that transfer, suggests that the mother's care was inadequate.

However, although this evidence is relevant, it has little probative value. The connection between the

mother's care and the child's retarded development is circumstantial. No direct evidence indicated that some act or omission of the mother caused the developmental lag.

Moreover, the child's developmental lag could have been caused by separation from her mother. The child had recently been forcibly taken from her mother's home by police. "[S]eparation from established attachment figures [has] been empirically linked to acute distress, conduct disorders, developmental and intellectual retardation, and the inability to form meaningful social relationships." Joan G. Wexler, *Rethinking the Modification of Child Custody Decrees*, 94 Yale L.J. 757, 800 (1985).

The testimony concerning Stephanie's regressive behavior after weekend visitations with her mother is not relevant evidence. As stated above, "current custodial conditions" include the food, shelter, and care that the child received under the initial custody and placement order. Once Stephanie was temporarily transferred to her father, the "current custodial conditions" of the initial order no longer existed. The child's regressive behavior is equally probative of the type of care Stephanie was receiving under the temporary order, as well as, of the care she was receiving under the initial order.

Moreover, as discussed above, the child's unruly behavior could have been caused by separation from the mother. No testimony, expert or otherwise, directly linked the child's behavior to acts or omissions by the mother.

Section 767.325(1)(a), Stats., requires the moving party to produce substantial evidence that modification is "necessary." As stated above, substantial means "con-

siderable in amount." The fact that the child was developmentally behind after leaving the care of her mother, by itself, does not constitute substantial evidence. Accordingly, there was no reasonable basis for the trial court's modification of custody.

Three other aspects of this case deserve discussion. First, our conclusion that proof of visitation interference, by itself, is not relevant to the sec. 767.325(1)(a), Stats., standard, does not leave trial courts without a reasonable remedy in cases where a parent continuously and unjustifiably refuses to allow court-ordered visitation. The legislature has expressly provided at least two such remedies.

The first remedy is mediation. Section 767.11, Stats., requires every county in the state of Wisconsin to set up a mediation system to address disputes over legal custody and physical placement. Under this section, trial judges are required to refer parties to mediation services in an action under sec. 767.325 where physical placement is contested. Section 767.11(5), Stats. Section 767.11 also requires the mediation system to provide legal custody and physical placement studies. Section 767.11(14)(a), Stats. These studies involve investigation into the "conditions of the child's home," "each party's performance of parental duties," and "[a]ny other matter relevant to the best interest of the child." *Id.* The results of these studies become part of the court record. Section 767.11(14)(b), Stats.

Why the trial court failed to order mediation in this case is unclear. Although enacted earlier, sec. 767.11, Stats., did not become mandatory until June 1, 1989. Section 767.11(15), Stats. Perhaps Rock county had not yet implemented a mediation system. In any event, this

remedy is now, by statute, available in all Wisconsin counties.

The second remedy is modification under sec. 767.325(1)(a), Stats. However, sec. 767.325(1)(a) is available only when the moving party makes a proper showing. The physical placement studies provided for in sec. 767.11 will assist the moving party with this burden.

The second aspect of this case which deserves discussion concerns one of the trial court's written conclusions of law. Specifically, the trial court concluded that Wendy's mental condition was emotionally harmful to the best interests of the child. The trial court based this conclusion on Wendy's failure to undergo a court-ordered psychiatric examination and her "contemptuous actions and reactions in and out of court."

The trial court's conclusion of law is erroneous for three reasons. First, the trial court is not an expert in mental health. It is not qualified to determine the mother's mental health and is not qualified to determine whether the mother's mental health is emotionally harmful to the best interests of the child.

Second, the mother's failure to undergo the court-ordered psychiatric testing is not reasonable grounds for the trial court, as a layman, to conclude that the mother was mentally unbalanced. The trial court ordered the mother to undergo mental health testing. For this purpose, she was referred to a local agency. The agency asked the mother to submit to two tests: a psychological examination performed by a psychologist and a psychiatric examination performed by a psychiatrist. The mother submitted to the psychological exam. The exam was performed and the results were presented at the modification hearing. With respect to the psychiatric exam, the psychiatrist asked the mother to sign some

type of release form pertaining to the results of the exam. This form is not in the record. She refused to sign this form. Because of this refusal, the psychiatrist refused to perform the exam.

Given these facts, the mother's failure to undergo the psychiatric exam does not indicate that she was mentally unbalanced. A reasonable person would certainly be cautious about releasing such personal information. Because the release is not part of the record, its scope is unclear. Moreover, the mother was apparently willing to submit to the exam. It was the psychiatrist who refused to perform the exam.

Third, the trial court's reference to "contemptuous actions and reactions in and out of court" presumably refers to the mother's denial of court-ordered visitation. Said denial is also not reasonable grounds for the trial court to conclude that the mother was mentally unbalanced. During the trial court proceedings, the mother alleged that she was not receiving court-ordered child support from the father. Accordingly, by denying visitation, she may have been trying to enforce her right to that support. At the contempt hearing, the mother did not have an attorney. She indicated that she could not afford one. Not an attorney herself, she presumably did not know how to bring a contempt motion for failure to pay child support. In fact, at the January 4 contempt hearing, the mother raised the issue of child support, but the trial court refused to address the issue because the motion before the court was contempt for violation of visitation, not contempt for nonpayment of child support.

The third aspect of this case which deserves discussion concerns a statement made by the guardian ad litem at oral argument. Specifically, the guardian ad litem

stated that he had spent a weekend with the child barricaded in the mother's residence. He implied that this experience somehow justifies the trial court's modification of custody. We disagree. The guardian ad litem's statements at oral argument are not evidence and not part of the record in this case. No evidence that the guardian ad litem visited the mother's home, observed the child barricaded in the home, or observed the child's living conditions was ever presented to the trial court. The guardian ad litem brought the modification motion and had the burden to produce such evidence. Obviously, if these alleged facts were not presented to the trial court, they cannot constitute a reasonable basis for the trial court's conclusion.

We reverse the trial court's temporary and permanent modification orders. Primary placement and sole legal custody of this child should be returned to the mother in accord with the initial, December 6, 1988, custody order.

*By the Court.*—The decision of the court of appeals is affirmed.

JON P. WILCOX, J. (*dissenting*). I dissent because I conclude that the trial court properly exercised its discretion in modifying its initial legal custody and physical placement award under sec. 767.325(1)(a). The record reflects that the trial court applied the proper "necessary to modify" legal standard in sec. 767.325(1)(a), and using a rational process, reached a reasonable conclusion that the current custodial conditions provided by the mother were physically and emotionally harmful to the best interests of the child.

The majority opinion states that "this court will not reverse unless there is no reasonable basis for the trial

court's exercise of discretion." Majority op. at 766. However, the majority takes a narrow view of the record to arrive at their conclusion that the trial court applied the wrong legal standard and that the facts applied to the proper legal standard do not support the trial court's conclusion.

I agree with much of the legal analysis pertaining to sec. 767.325(1)(a) set forth in the majority opinion on pages 760 through 766. However, I believe the majority erroneously concludes that the trial court misapplied the law in this case and that the facts do not support the trial court's conclusion.

The trial court's written conclusions of law that were issued with its order transferring custody of the child to the father stated:

> Pursuant to Wisconsin Statutes sec. 767.324(1) [sic], the Court concludes that the Guardian ad Litem and [Father] have shown by substantial evidence that modification of the Court's December 6, 1988 order granting custody to [the mother] *must* be modified because custody with [the mother] is emotionally harmful to the best interest of [the child]. (Emphasis added.)

This statement indicates that the trial court was aware of and applied the proper legal standard. The trial court concluded that it was necessary to modify its initial custody order because custody with the mother was emotionally harmful to the child. This was a reasonable conclusion based upon the record and the trial court's stated findings.

The mother, after repeated court orders, refused to allow the father visitation with the child. Finally, the trial court found it necessary to temporarily transfer custody to the father to allow the child to see her father.

The majority opinion concludes that the mother's denial of visitation with the father was not relevant because the guardian ad litem did not show that the denial was physically or emotionally harmful to the child. Majority op. at 768. Apparently the majority would require expert testimony that denying a child the right to see one of her parents is emotionally harmful to the child. I believe it is a matter of common knowledge that denying a child the right to visit one of her parents could be emotionally harmful to the child. A prefatory note to 1987 Act 355, sec. 46 which enacted sec. 767.325, Stats., states:

> In its study, the special committee on custody arrangements concluded that the current laws and practices relating to child custody determinations in divorce and other actions affecting the family:
>
> > 1. Do not adequately stress the importance of the best interest of the child and *the significance to the child, in most cases, of a continuing, meaningful relationship with both parents.* (Emphasis added.)

The majority opinion thwarts Wisconsin's policy of encouraging a relationship with both parents by encouraging custodial parents to deny court ordered visitation to non-custodial parents.

In this case, the trial court found the mother in contempt. The trial court ordered the mother to jail, but later withdrew the sentence. Of course had the trial court enforced the jail sentence, it would have been necessary to temporarily transfer custody of the child to the father while the mother served her jail time. Jail is a poor remedy in these situations because it does more harm than good. Enforcing a jail sentence against a custodial parent creates the risk that the parent will lose his or her job and causes a loss of income during the time the jail

sentence is served. More importantly, sentencing a parent to jail might cause emotional harm to the child.

The majority opinion at page 764 quotes the court of appeals which stated, "[I]n [this] two-year period of finality and stability, the courts are not to be battlefields where wounded parents turn their children as weapons against one another." However, this is exactly what the mother did in this case. The mother used the child as a weapon against the father by refusing to allow the father visitation with his daughter. The majority opinion leaves the trial court without a reasonable remedy in these type of contempt situations.

While I believe the mother's repeated refusal to comply with the trial court's visitation order was enough to meet the requirements of sec. 767.25(1)(a), there was additional evidence of physical and emotional harm upon which the trial court could have rationally relied to reach its conclusion. The trial court found that there was substantial evidence in the record that the mother did not appropriately interact with the child, causing emotional harm to the child. While under the mother's care, the child was developmentally behind with respect to her verbal skills, social emotional development, gross motor skills, and fine motor skills. The child became unruly after visits with her mother. The mother's refusal to comply with the trial court's order for a psychiatric evaluation together with her contemptuous actions in and out of court led the trial court to conclude that the mother's mental condition was emotionally harmful to the child.

The court appointed Anita Kropf as an expert in this case. Kropf has a masters in social work and is the director of the Community Counseling Center in Janesville, Wisconsin. Kropf testified that living with the mother would be emotionally harmful to the best inter-

ests of the child. Kropf recommended that the father retain custody of the child. Kropf based her opinion and recommendation on the psychological examinations performed by Dr. Richard Schlaefer on the mother, father, and father's fiance. Kropf also utilized the psychiatric evaluations of the father and father's fiance performed by Dr. Marek Hann.

Dr. Schlaefer is a psychologist who works for Anita Kropf at the Community Counseling Center. Dr. Schalefer is also an associate professor in the Psychology Department at the University of Wisconsin-Whitewater. Dr. Schlaefer diagnosed the mother as having an adjustment disorder with mixed emotional features. Dr. Schlaefer testified that the mother would keep the child isolated from the mainstream of social life.

The guardian ad litem spent a weekend with the child in the mother's home. The guardian ad litem stated at oral argument that the child was barricaded in the home and was not allowed contact with other children or adults. The guardian ad litem is the party who brought the motion to transfer custody because after visiting the mother's home and witnessing the child's living conditions, he felt an emergency situation existed which was physically and emotionally harmful to the child.

The child is now five years old and has been in the father's custody for over four years. The reality of this case is that after the majority opinion is issued the child will be returned to the custody of her mother. The father then may file a new motion with the court seeking custody of the child under the "best interests" standard of sec. 767.325(1)(b), because the initial custody order is now more than two years old. The most unfortunate consequence of this case is that the emotional well-being of an innocent child has been irreparably harmed.

I conclude that the trial court properly exercised its discretion in modifying its initial custody and physical placement award because there was substantial evidence in the record that the custodial conditions provided by the mother were physically and emotionally harmful to the best interests of the child.

I would reverse the decision of the court of appeals.

I am authorized to state that Justices CECI and BABLITCH join in this dissent.