IN the MATTER OF the VISITATION OF Z. E. R.:

F. R., Petitioner-Respondent,

v.

T. B., Respondent-Appellant.

Court of Appeals

*No. 98–0819. Submitted on briefs January 12, 1999.—Decided March 11, 1999.*

(Also reported in 593 N.W.2d 840.)

629

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Michael J. Briggs* of *Briggs Law Office* of Madison.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Judith Sperling Newton* and *Laura Skilton Verhoff* of *Stafford, Rosenbaum, Rieser & Hansen* of Madison.

Before Dykman, P.J., Eich and Deininger, JJ.

DYKMAN, P.J. T.B. appeals from several orders surrounding the trial court's decision to grant his son's maternal grandmother, F.R., visitation privileges under § 880.155, STATS.[1] He argues that the trial court exceeded its authority under the statute and the U.S. Constitution when it issued the order. In addition, he contends that the trial court erred when it ordered him to pay a portion of an expert witness's fees. We disagree with these assertions. Finally, T.B. contends that the trial court exceeded its statutory authority under § 880.155 when it ordered him to obtain psychotherapeutic treatment for his son. We agree. Accordingly, we affirm in part and reverse in part.

## BACKGROUND

T.B. is the father of Z.E.R., who was born December 24, 1989. C.R. was Z.E.R.'s mother. C.R. and T.B.

[1] It is standard procedure for this court to use the first name and last initial when referring to parties in sensitive matters; however, the parties in this case requested that we refer to them using only their initials. An order was granted to this effect on June 10, 1998.

were never married, but they lived together until August 1992, when F.R. and Z.E.R. moved out. T.B. was adjudicated Z.E.R.'s father in February 1993. During those proceedings, the trial court appointed Marlene Porter to act as Z.E.R.'s guardian ad litem.

From August 1992 until August 1994, C.R.'s mother, F.R., assisted with Z.E.R.'s upbringing. F.R. sometimes lived with Z.E.R., other times she would live nearby, but she was always available to care for Z.E.R., and did so extensively. During this period, Z.E.R. spent approximately five days a week with C.R. and F.R., and two days a week with T.B.

In October 1993, C.R. petitioned for sole custody of Z.E.R. The matter was referred to the Dane County family court counseling service, and Eileen Breitweiser was the appointed family court counselor. In August 1994, C.R. died. While her petition was never heard, the family court counseling service's recommendation was for joint legal custody, and for Z.E.R. to spend seventy percent of his time with F.R. and thirty percent of his time with T.B.

In September 1994, with the assistance of Marlene Porter and Eileen Breitweiser, T.B. and F.R. were able to work out a visitation schedule that would allow Z.E.R. to live with T.B. and still have regular visitation with F.R. F.R. alleges that approximately nine months after the schedule had been in place, T.B. began changing the dates and the times when Z.E.R. could visit with her, and stated that he would not allow Z.E.R. to have any more overnight or weekend visits with her. T.B. then allegedly informed F.R. that she could no longer see Z.E.R. or speak to him on the phone, and that she could only see Z.E.R. at T.B.'s convenience. T.B. disputes these allegations, and states that he never denied F.R. reasonable visitation with Z.E.R.

In August 1995, F.R. petitioned the trial court for a visitation order under § 880.155, STATS., to incorporate the schedule that had been in effect since September 1994. On September 6, 1995, the court entered a temporary order for visitation. On July 26, 1996, F.R. requested that the case be referred to the Dane County family court counseling service for a study, and for Eileen Breitweiser to continue to act as the family court counselor. On April 9, 1997, the temporary order was amended based on the joint recommendation of Eileen Breitweiser and Marlene Porter, who the court re-appointed to act as Z.E.R.'s guardian ad litem.

The April 9 temporary order modified the prior visitation schedule. Under this amended order, F.R. was allowed visitation with Z.E.R. every other weekend from 3:00 p.m. on Friday until 6:00 p.m. on Sunday, and every Monday from 2:00 p.m. until T.B. returned from work, and she was entitled to spend two weeks of vacation a year with Z.E.R. In addition, the order required T.B. to disclose to F.R. the names of all of Z.E.R.'s treating medical care providers, and to sign releases allowing each medical care provider to give her access to information regarding Z.E.R.'s medical condition and treatment. F.R., however, was not allowed to make medical care decisions for Z.E.R., and she was ordered to always follow the physician's proscribed treatment. Also, F.R. was allowed to participate in Z.E.R.'s non-academic school activities, which were recreational and/or social in nature, but she was not allowed to make any educational decisions for Z.E.R.

On April 18, 1997, the trial court appointed Dr. Michael Spierer, a psychologist, to interview and evaluate F.R. and T.B. The court ordered F.R. and T.B. to each pay one-half of the costs associated with these

interviews and evaluations. Dr. Spierer conducted these evaluations, filed a report, and testified as to his opinions and conclusions.

The temporary order was amended again on October 2, 1997, and the trial was postponed until January 23, 1998. In the interim, the court again modified the temporary order. The amended order stated that F.R. was allowed visitation with Z.E.R. every other weekend from 2:00 p.m. on Friday until 8:00 a.m. on Monday, and every week from 3:00 p.m. on Monday until 8:00 a.m. on Tuesday. Z.E.R. was also allowed to have additional visitation with F.R. during any period of time when he was not in school, in an organized activity, or with his father. These periods of visitation were to include individual days off from school, school vacations, summer breaks, and after school on school days. During summer breaks, Z.E.R. was to be enrolled in a structured camp or activity during the day, if possible. During any period of time in which Z.E.R. was not participating in a structured activity or with his father, he was to be with F.R.

On March 6, 1998, the trial court entered yet another order regarding visitation. This order incorporated many of the terms and conditions set out in previous orders with certain exceptions. The order stated the T.B. would have priority over F.R. whenever he was off work, except during F.R.'s regular weekend visitation period. The order also allowed Z.E.R. to have additional visitation with F.R. every Monday, Wednesday and Friday when he was not in school, in an organized activity, or with his father. It also provided T.B. with the opportunity to structure Z.E.R.'s after-school activities on Tuesdays and Thursdays; however, if he failed to specify a scheduled activity, Z.E.R. would be with F.R.

The order also stated that T.B. was to select an appropriate psychotherapist for Z.E.R. Marlene Porter, Z.E.R.'s guardian ad litem, was permitted to meet with the therapist and share information relevant to Z.E.R.'s treatment, including, but not limited to, Dr. Spierer's evaluation, Ms. Breitweiser's court report, and Z.E.R.'s school journal. T.B. and F.R. also were required to participate in Z.E.R.'s therapy if requested to do so by the therapist.[2] T.B. appeals from these orders.

## STANDARD OF REVIEW

This case presents several novel issues. The majority of the issues concern the scope of a trial court's authority to grant visitation privileges to a grandparent under § 880.155(2), STATS. The pertinent portion of this statute reads as follows:

> If one or both parents of a minor child are deceased and the child is in the custody of the surviving parent or any other person, a grandparent or stepparent of the child may petition for visitation privileges with respect to the child, whether or not the person with custody is married. The grandparent or stepparent may file the petition in a guardianship or temporary guardianship proceeding under this chapter that affects the minor child or may file the petition to commence an independent action under this chapter. The court may grant *reasonable visitation* privileges to the grandparent or stepparent if the surviving parent or other person who has custody of the child has notice of the

---

[2] On June 11, 1998, the court again amended its order, but the modifications contained within it are not at issue in this appeal.

hearing and if the court determines that visitation is in *the best interest of the child.*

Section 880.155(2), STATS. (emphasis added).

We have held in other contexts that the determination of a child's best interests depends on firsthand observation and experience with the persons involved, and therefore, it is left to the discretion of the trial court. *See Gerald O. v. Cindy R.*, 203 Wis. 2d 148, 152, 551 N.W.2d 855, 857 (Ct. App. 1996) (termination of parental rights); *Andrew J.N. v. Wendy L.D.*, 174 Wis. 2d 745, 765–66, 498 N.W.2d 235, 241 (1993) (modification of custody and placement arrangement). We will affirm a trial court's discretionary determination so long as it examines the relevant facts, applies the proper legal standard, and uses a demonstrated rational process to reach a conclusion that a reasonable judge could reach. *See Loy v. Bunderson*, 107 Wis. 2d 400, 414–15, 320 N.W.2d 175, 184 (1982). However, when the contention is that the trial court erroneously exercised its discretion because it applied an incorrect legal standard, we review that issue de novo. *See Kerkvliet v. Kerkvliet*, 166 Wis. 2d 930, 939, 480 N.W.2d 823, 826 (Ct. App. 1992).

DISCUSSION

### I. *Visitation Order*

T.B. alleges that the trial court made numerous errors regarding its visitation order. First, he contends that the trial court erred as a matter of law when it applied a broad "best interests of the child" standard. Second, he argues that the trial court exceeded its authority under § 880.155, STATS., when it granted F.R. "unreasonable" visitation privileges. Third, he con-

637

tends that the trial court erred when it appointed a guardian ad litem, required the parties to cooperate with the family court counselor, and ordered the parties to undergo psychological evaluations. Fourth, he argues that the court's order violated his constitutional right to raise his son free from governmental interference. Finally, he contends that the court erred when it denied his motion not to consider certain evidence when making its visitation decisions. We will address each of these in turn.

### a. *Best Interests of the Child*

T.B. contends that the trial court erred as a matter of law when it interpreted the phrase "best interests of the child" broadly. He argues that while the trial court is permitted under § 880.155(2), STATS., to determine whether reasonable visitation is in the child's best interests, it is not permitted to use the "best interests" language to undermine his parental autonomy.

■

The proper interpretation of the "best interests" language in § 880.155(2), STATS., presents a question of law that we review de novo. *See Hughes v. Chrysler Motors Corp.*, 197 Wis. 2d 973, 978, 542 N.W.2d 148, 149 (1996). The goal of statutory interpretation is to ascertain and give effect to the intent of the legislature. *See Stockbridge School Dist. v. Department of Pub. Instruction School Dist. Boundary Appeal Bd.*, 202 Wis. 2d 214, 219, 550 N.W.2d 96, 98 (1996). Our first inquiry is always to look at the plain language of the statute. *See Cary v. City of Madison*, 203 Wis. 2d 261, 264, 551 N.W.2d 596, 597 (Ct. App. 1996). If the language is clear and unambiguous, our inquiry ends and we apply the language of the statute to the facts of the case. *See Peter B. v. State*, 184 Wis. 2d 57, 71, 516

N.W.2d 746, 752 (Ct. App. 1994). However, if the language is ambiguous, we may look to the history, scope, context, subject matter, and object of the statute to discern legislative intent. *See Lake City Corp. v. City of Mequon*, 207 Wis. 2d 155, 164, 558 N.W.2d 100, 103 (1997).

There is nothing in the language of § 880.155, STATS., that defines what the court is to consider when determining the "best interests of the child." Nor is there anything in the legislative history of the statute that suggests how the term "best interests" should be interpreted. We therefore look to other statutes in which this term is used. When lawmakers knowingly use the same phrase or terminology in two different statutes addressing similar topics, we presume that the legislature intended them to have the same meaning in both statutes. *C.f. Hollibush v. Ford Motor Credit Co.*, 179 Wis. 2d 799, 806, 508 N.W.2d 449, 452 (Ct. App. 1993).

The phrase "best interests of the child" is used throughout chapters 48 and 767, STATS. Chapter 48 deals primarily with children in need of protective services, and ch. 767 deals with actions affecting the family. Section 767.245, STATS., addresses visitation rights of non-parents, and it contains language strikingly similar to § 880.155, STATS. It reads in pertinent part as follows:

> (1) Except as provided in sub. (2m), upon petition by a grandparent, greatgrandparent, stepparent or person who has maintained a relationship similar to a parent-child relationship with the child, the court may grant reasonable visitation rights to that person if the parents have notice of the hearing and if the court determines that visitation is in the best interest of the child.

(2) Whenever possible, in making a determination under sub. (1), the court shall consider the wishes of the child.

(2m) Subsection (3), rather than sub. (1), applies to a grandparent requesting visitation rights under this section if sub. (3)(a) to (c) applies to the child.

(3) The court may grant reasonable visitation rights, with respect to a child, to a grandparent of the child if the child's parents have notice of the hearing and the court determines all of the following:

(a) The child is a nonmarital child whose parents have not subsequently married each other.

(b) Except as provided in sub. (4), the paternity of the child has been determined under the laws of this state or another jurisdiction if the grandparent filing the petition is a parent of the child's father.

(c) The child has not been adopted.

(d) The grandparent has maintained a relationship with the child or has attempted to maintain a relationship with the child but has been prevented from doing so by a parent who has legal custody of the child.

(e) The grandparent is not likely to act in a manner that is contrary to decisions that are made by a parent who has legal custody of the child and that are related to the child's physical, emotional, educational or spiritual welfare.

(f) The visitation is in the best interest of the child.

In light of these similarities, we look to other provisions within ch. 767, STATS., for guidance on how to interpret the "best interests" language. Section 767.24(5), STATS., provides the most extensive explana-

tion of what a trial court should consider when determining the "best interests of the child." It reads:

> In determining legal custody and periods of physical placement, the court shall consider all facts relevant to the best interest of the child. . . . The court shall consider reports of appropriate professionals if admitted into evidence when legal custody or physical placement is contested. The court shall consider the following factors in making its determination:
>
> (a) The wishes of the child's parent or parents.
>
> (b) The wishes of the child, which may be communicated by the child or through the child's guardian ad litem or other appropriate professional.
>
> (c) The interaction and interrelationship of the child with his or her parent or parents, siblings, and any other person who may significantly affect the child's best interest.
>
> (d) The child's adjustment to the home, school, religion and community.
>
> (e) The mental and physical health of the parties, the minor children and other persons living in a proposed custodial household.
>
> (f) The availability of public or private child care services.
>
> (g) Whether one party is likely to unreasonably interfere with the child's continuing relationship with the other party.
>
> (h) Whether there is evidence that a party engaged in abuse, as defined in s. 813.122(1)(a), of the child, as defined in s. 48.02(2).
>
> (i) Whether there is evidence of interspousal battery as described under s. 940.19 or 940.20(1m) or domestic abuse as defined in s. 813.12(1)(a).

641

(j) Whether either party has or had a significant problem with alcohol or drug abuse.

(k) Such other factors as the court may in each individual case determine to be relevant.

■ In the absence of an alternate definition or explanation, we are satisfied that § 767.24(5), STATS., sets out an appropriate standard for determining the "best interests of the child" under § 880.155, STATS. We therefore must determine whether the trial court's inquiry in this case conforms with this broad standard.

### b. *Guardian Ad Litem, Mediation, and Psychological Evaluations*

T.B. contends that the trial court misinterpreted the scope of the "best interests" language when it: (1) appointed Attorney Marlene Porter as the guardian ad litem for Z.E.R.; (2) referred the case to the family court counseling service for mediation; and (3) appointed Dr. Michael Spierer to conduct psychological evaluations and clinical interviews of the parties. T.B. argues that while the court is authorized under various provisions in chs. 48 and 767, STATS., to issue these orders, *see* §§ 48.235(1)(a) and 767.045(1)(a), STATS. (appointment of guardian ad litem), § 767.11(5), STATS. (mediation referrals); and § 767.24(5)(e), STATS. (court must consider mental health of parties and child), it has no such authority under § 880.155, STATS. We disagree.

Generally, when a trial court is confronted with a situation under chs. 48 or 767, STATS., it will appoint a guardian ad litem to be an advocate for the child's best interests. *See* §§ 48.235(3) and 767.045(4), STATS.; *see also Joshua K. v. Nancy K.*, 201 Wis. 2d 655, 660, 549 N.W.2d 494, 496 (Ct. App. 1996). While the trial court is not bound by the guardian ad litem's findings and

conclusions, they may assist the court in making its own determination.

In this case, the trial court was asked to determine whether grandparent visitation would be in Z.E.R.'s best interests. It therefore needed evidence as to what his best interests were. And because there was great animosity between F.R. and T.B., it decided to appoint others to assist in gathering evidence that would allow it to make the appropriate decision.

Marlene Porter was very familiar with this case. She acted as Z.E.R.'s guardian ad litem during the 1993 paternity proceedings, and she is familiar with how Z.E.R. benefits from contact with both T.B. and F.R. In light of these facts, we are satisfied that in the context of these proceedings, the appointment was contemplated by § 880.155, STATS., and was not an erroneous exercise of discretion.

Next, we consider the trial court's decision to refer the case to mediation. The parties initially had agreed upon a visitation arrangement, but problems arose and the parties no longer adhered to that arrangement. The trial court apparently decided that it would be in Z.E.R.'s best interests if the dispute over visitation was resolved without further hostility between F.R. and T.B., so it referred the matter to family court counseling services in the hopes that mediation would assist the parties in peacefully reaching an agreement. Because an end to hostility directly affects the best interests of Z.E.R., we see no reason why ordering mediation was an erroneous exercise of discretion.

As to the psychological examinations and clinical interviews, § 767.24(5)(e), STATS., provides that when a

643

trial court is determining the best interests of the child, it should consider the mental and physical health of the parties and the child. The trial court appointed Dr. Spierer to conduct examinations and report his findings. These evaluations were intended to assist the trial court in deciding whether visitation was in Z.E.R.'s best interests and, if so, what amount would be reasonable. We therefore conclude that the trial court did not erroneously exercise its discretion in ordering the parties to submit to Dr. Spierer for a psychological examination.

### c. *Reasonable Visitation*

T.B. also contends that the trial court misinterpreted the "best interests" language when it granted F.R. unreasonable visitation privileges.[3] We are satisfied that the appropriate standard for reviewing the

---

[3] T.B. argues that the visitation order amounts to placement, and therefore exceeds the intended scope of § 880.155, STATS. He cites to § 767.001(5), STATS., which defines physical placement as follows:

> [T]he condition under which a party has the right to have a child physically placed with that party and has the right and responsibility to make, during that placement, routine daily decisions regarding the child's care, consistent with major decisions made by a person having legal custody.

We are satisfied that the court's order in this case does not amount to physical placement. The trial court did not give F.R. authority to make "major decisions" regarding her grandson. *See* § 767.001(2m), STATS. (defines "major decisions" to include, among others, decisions regarding health care, choice of school and religion). The court's order specifically precludes her from making health care and educational decisions, which are both areas that a person with legal custody would have decision-making authority.

644

reasonableness of the trial court's visitation order is whether it erroneously exercised its discretion. We look to see whether there is a reasonable basis in law and in fact for the court's discretionary act. *See Gerald O.*, 203 Wis. 2d at 152, 551 N.W.2d at 857.

We already have concluded that the trial court applied the appropriate legal standard in deciding this case; therefore, we must determine whether the evidence the court considered supports its conclusion. In its order, the trial court set out several specific examples of how Z.E.R. benefits from regularly visiting with his grandmother:

> [F.R.] has a very positive influence on [Z.E.R.'s] life, and she is able to provide [Z.E.R.] with experiences and views that he will not obtain from [T.B.] She provides a maternal influence which [Z.E.R.] needs and which he will not get solely with [T.B.] and [T.B.'s] father. She also provides a nurturance which is different from that provided by [T.B.] and which is lacking from his paternal grandfather. She has interpersonal social skills that assist [Z.E.R.'s] development, a sense of confidence and worldliness to which [Z.E.R.] is not otherwise exposed and an exposure to relationships with women that [Z.E.R.] needs. . . . F.R. has not sought to take the place of, or to interfere with, [T.B.'s] role as a father; rather, she seeks to complement what [T.B.] offers and to provide enriching and loving experiences for [Z.E.R.]

While the court recognized that it was affording F.R. substantial visitation privileges, it found that substantial visitation was warranted. This is evidenced by a statement it made when issuing its oral decision:

> It is clear to me that [Z.E.R.] has a longstanding and significant grandparent/grandson

645

relationship with [F.R.] Part of that emanates from the death of [Z.E.R.'s] mother, F.R., but part of that is also independent of the relationship that [Z.E.R.] had with his deceased mother.

. . . .

Even though I believe that both [T.B.] and [F.R.] have much to offer [Z.E.R.], it is clear to me that [F.R.] brings some unique capacities and some unique emotional resources to [Z.E.R.] that he is in particular need of as a result of the death of his mother and that given the lay of the landscape can only be met by [F.R.'s] *substantial and constructive involvement* in [Z.E.R.'s] life. The fact that [Z.E.R.] is currently prospering under the current temporary order is some further corroboration of the benefits to [Z.E.R.] from [F.R.'s] *substantial involvement* in his life.

(Emphasis added.)

We agree with T.B. that the visitation order is expansive, but we do not agree that it is unreasonable. The trial court was satisfied based on the evidence presented that Z.E.R. benefited from substantial interaction with his grandmother, and that Z.E.R. would continue to benefit from having substantial contact with her. As a result, the trial court determined that it would be in Z.E.R.'s best interests to issue an extensive visitation schedule.[4]

---

[4] T.B. cites to *Sketo v. Brown*, 559 So. 2d 381 (Fla. App. 1990), *Von Eiff v. Azicri*, 699 So. 2d 772 (Fla. App. 1997), *Herndon v. Tuhey*, 857 S.W.2d 203 (Mo. 1993), *Komosa v. Komosa*, 939 S.W.2d 479 (Mo. App. 1997), *Peterson v. Peterson*, 559 N.W.2d 826 (N.D. 1997), and *Goff v. Goff*, 844 P.2d 1087 (Wyo. 1993) for the proposition that other jurisdictions would have found the visitation order in this case to be unreasonable. After reviewing these cases, we are satisfied that they have no bearing on our review of the trial court's decision. We are to

It also is important to note that a significant portion of F.R.'s visitation with Z.E.R. occurs after-school when his father is at work. If the trial court would not have included this provision in the order, T.B. would have been forced to find a caregiver, probably requiring him to hire someone at least for a portion of the time. The court simply determined that it would be in Z.E.R.'s best interests if F.R. were pre-selected as that alternate caregiver.

■

Furthermore, the order also does not substantially interfere with T.B.'s ability to be with his son when he is not at work. For the most part, when T.B. is off work, and Z.E.R. is not in school or in a structured activity, T.B. can be with his son.[5] And even when T.B. cannot be with his son, the order allows him to decide what his son will be doing after-school. As a result, we conclude

---

determine whether the trial court applied the appropriate legal standards and considered all the relevant facts when making its decision. Whether appellate courts in other jurisdictions would disagree with the trial court's findings in this case offers little to our analysis.

[5] T.B. has very significant rights, both in time spent with his son and in his ability to preempt or alter F.R.'s visitation times with Z.E.R. The March 6 order, which is later clarified in a June 11 order, allows T.B. to elect to be with his son whenever he is not at work, including holidays, except for those weekends and two vacation weeks a year that Z.E.R. is scheduled to be with F.R. T.B. may elect to be with his son during the week even if Z.E.R. is scheduled to be with F.R., other than these previously mentioned periods, as long as he is off work. If he elects to preempt F.R.'s visitation on Monday, Wednesday, or Friday, he must then allow Z.E.R. to spend the following Tuesday or Thursday, with F.R. And while there are other minimal limitations imposed by the court regarding visitation, they do not significantly affect T.B.'s right to be with his son.

that while the trial court may have approached the limits of its discretionary authority under § 880.155, STATS., it did not exceed them.

### d. *Constitutional Violations*

Finally, T.B. claims that the visitation order violated his constitutional right to raise his child free from governmental interference.[6] We disagree. While a parent has a fundamental liberty interest in the care, custody and management of his or her children, *see generally, Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Lassiter v. Department of Social Services*, 452 U.S. 18, 27 (1981), that right is not absolute, *see Moore v. East Cleveland*, 431 U.S. 494, 502 (1977), and it was not violated in this case. The trial court's order granted F.R. substantial visitation privileges, but it did not affect T.B.'s right to make important parenting decisions regarding his child. He retains exclusive authority to decide matters associated with raising a child, such as religion, health care, education, discipline, and general welfare. *See Wisconsin v. Yoder*, 406 U.S. 205 (1972) (parents may withdraw child from school on religious grounds despite mandatory education requirements); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) (sale of religious materials by children contrary to child labor laws); *Pierce v. Society of the Sisters*, 268 U.S. 510 (1925) (government cannot require a parent to send child to public schooling); *Meyer v. Nebraska*, 262 U.S. 390 (1925) (parents have right to chose in what language their child will be edu-

---

[6] T.B. specifically states that he is not challenging the constitutionality of § 880.155, STATS., on its face, but rather its application in this case.

cated). Therefore, we find no basis for his claim that the court's order violated his constitutional rights as a parent.

### e. *Motion in Limine*

In several of the arguments previously addressed, T.B. argues that the trial court considered irrelevant and prejudicial information when making its decision. He sought to eliminate much of this evidence when he filed a motion in limine. The most significant piece of evidence that he sought to have excluded was F.R.'s fifty-six paragraph affidavit, which contained more than forty separate allegations of misconduct, bizarre conduct or poor parenting by T.B., as well as misconduct and hostility on the part of T.B.'s father.[7] T.B. argues that it was this affidavit, and all the immaterial information included within it, that led the court to rule in the manner in which it did. T.B. argues that without this affidavit, there would have been no way for the court to make the findings concerning his alleged weaknesses as a father and F.R.'s alleged strengths as a grandmother, and that it therefore erred in not granting his motion in limine.

A motion in limine is reviewed under a discretionary standard and will not be reversed if the trial court made a reasonable decision based on the pertinent facts and applicable law. *See General Accident Ins. Co. of America v. Schoendorf & Sorgi*, 202 Wis. 2d 98, 107–08, 549 N.W.2d 429, 433 (1996). When the trial court addressed T.B.'s motion in limine, it said:

---

[7] T.B.'s motion in limine spoke to the substance of whether evidence of T.B.'s alleged unfitness as a parent would be at issue. T.B. did not make other objections to the use of the affidavit.

To the extent this can be construed as her version as to why it is she offers things to [Z.E.R.] that [Z.E.R.] wouldn't get from time spent with [T.B.], I think that's fine, and then specifically indicating that this is not being received or would be received for purposes of attempting to prove that [T.B.] is other than a fit parent.

. . . .

To the extent they illuminate what it is she feels she has to offer to [Z.E.R.] that he doesn't, I guess those would be the only bases on which I would consider the affirmative statements of [F.R.] in her affidavit.

. . . .

I'm trying to take us out of litigating any of this and get to the present issues of what in [Z.E.R.'s] best interests in terms of the potential visitation order. It seems to me I've considerably, and I emphasize the word "considerably," narrowed the scope for which this affidavit may be considered . . . .

We conclude that the court admitted the affidavit for narrow and limited purposes. It repeatedly stated that it was not going to use the affidavit to determine whether T.B. was an unfit parent. The trial court recognized on several occasions during the proceedings and in its orders that T.B. was a fit parent, but it also reviewed documents and heard testimony that F.R. was able to provide Z.E.R. with things that his father could not. In short, we are satisfied that the trial court did not erroneously exercise its discretion when it considered F.R.'s affidavit for limited and relevant purposes.

## II. *Psychotherapeutic Treatment for Z.E.R.*

■

T.B. argues that the trial court misinterpreted its authority under § 880.155, STATS., when it ordered him to obtain psychotherapeutic treatment for his son, and that it violated his constitutionally protected liberty interest in parental autonomy as well as his guaranteed right to equal protection. We first address his assertion that the trial court misinterpreted its statutory authority in ordering T.B. to obtain treatment for his son. The application of a statute to a particular set of facts is a question of law that this court reviews de novo, owing no deference to the trial court's reasoning. *See Minuteman, Inc. v. Alexander*, 147 Wis. 2d 842, 853, 434 N.W.2d 773, 778 (1989).

■

We have already held that under § 880.155, STATS., a trial court may make an extensive but reasonable inquiry to determine the child's best interests for the purpose of ascertaining whether grandparent visitation is appropriate and, if so, what amount is reasonable. The question then becomes whether the trial court may take other actions that arguably promote or protect the best interests of the child, which fall outside the realm of visitation. We conclude that it cannot. The trial court in this case approached the limits of its discretionary authority under § 880.155, STATS., when it granted F.R. extensive visitation privileges, but it exceeded that authority when it ordered T.B. to obtain psychotherapeutic treatment for Z.E.R. The "best interests of the child" language of § 880.155 relates to visitation. It cannot be read so broadly as to give the trial court the power to order a parent to provide specified medical treatment to his or her child. As the supreme court noted in *Groh*, 110 Wis. 2d at 126,

327 N.W.2d at 659, "[i]f the trial court has the power to make any order it pleased so long as the order could somehow be justified by recitation of the rubric 'in the best interests of the children,' the limits the legislature placed on the court's exercise of power . . . would be meaningless."

F.R. argues that while she brought her action under § 880.155, STATS., it is a proceeding under ch. 48, STATS., and ch. 48 allows courts to liberally effectuate the best interests of a child. She cites § 48.14(11), STATS. However, § 48.14(11) merely states that juvenile courts have exclusive jurisdiction over granting visitation privileges under § 880.155. It does not provide that rules and procedures that apply to ch. 48 proceedings are also applied in § 880.155 proceedings. If the legislature intended for those rules and procedures to apply, it would have included § 880.155 within ch. 48. Because we conclude that the trial court misinterpreted its authority under § 880.155, STATS., in ordering T.B. to obtain medical treatment for his son, we need not address T.B.'s assertion that by doing so, the trial court violated his constitutional liberty interest and right to equal protection.

We conclude, however, that the trial court could authorize F.R. to see Z.E.R.'s medical and psychological records. It is important for any caregiver, whether it be an evening baby-sitter or a full-time care provider, to have some knowledge of a child's medical and psychological data. It is in the child's best interest that persons caring for the child know of the child's medical and psychological history and conditions. The trial court did not erroneously exercise its discretion when it concluded that it would be in Z.E.R.'s best interest for

F.R. to have access to Z.E.R.'s medical and psychological records.

### III. *Expert Witness Fees*

Finally, T.B. argues that the trial court erred when it ordered him to pay part of Dr. Spierer's fees for testifying at trial. F.R. contends that Dr. Spierer was a court-appointed witness, and his compensation was governed by § 907.06, STATS. T.B. disagrees, stating that the trial court never formally appointed Dr. Spierer as an expert witness. The application of a statute to a particular set of facts is a question of law that this court reviews de novo, owing no deference to the trial court's reasoning. *See Minuteman, Inc.*, 147 Wis. 2d at 853, 434 N.W.2d at 778.

Under § 907.06, STATS., the trial court is permitted to appoint an expert witness to assist the court in understanding the evidence. The rule reads in pertinent part as follows:

> (1) APPOINTMENT. The judge may on the judge's own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The judge may appoint any expert witnesses agreed upon by the parties, and may appoint witnesses of the judge's own selection. An expert witness shall not be appointed by the judge unless the expert witness consents to act. . . . A witness so appointed shall advise the parties of the witness's findings, if any; the witness's deposition may be taken by any party; and the witness may be called to testify by the judge or any party. The witness shall be subject to cross-examination by each party, including a party calling the expert witness as a witness.

653

(2) COMPENSATION. Expert witnesses so appointed are entitled to reasonable compensation in whatever sum the judge may allow. . . . In civil cases the compensation shall be paid by the parties in such proportion and at such time as the judge directs, and thereafter charged in like manner as other costs but without the limitation upon expert witness fees prescribed by s. 814.04 (2).

T.B. points out that there is nothing in the record showing that the trial court followed any of the procedures set out in § 907.06(1), STATS., when it appointed Dr. Spierer to be an expert witness. T.B. notes that the only order of record stated that the parties were to share equally the cost of the psychological evaluations and clinical interviews; there was nothing in the order regarding Dr. Spierer's fees if he were to appear in court as a witness. T.B. argues that because F.R. called the doctor to testify as a witness, she should bear the cost of his witness' fees.[8]

---

[8] The trial court responded to this argument as follows:

THE COURT: I would direct your attention to statute 907.06 (2) which is the statute under which Dr. Spierer was appointed, and it deals with court-appointed experts. Subsection (2) deals with compensation of court-appointed experts. . . . I think this is a very clear grant of authority of the Court to equitably apportion the costs of an expert witness appointed by the Court which is a very different matter than if this were somebody that you had initially retained and then the other side decides to call them as a witness. Obviously in that circumstance your argument would have considerable force. Here it's the normal practice to share the cost of a court-appointed expert equally unless there is some unusually equitable factor that should justify a deviation from a 50/50 allocation. My presumption is that until and unless the situation changes by the end of this litigation that we would follow that course here, and so provisionally I'm going to assume that Dr. Spierer's fees, whatever they are, will be shared equally by the parties under the authority of that statute. . . .

. . . .

We are satisfied that the trial court considered Dr. Spierer to be a court-appointed witness under § 907.06(1), Stats., and it ordered T.B. to pay one-half of the doctor's fees consistent with § 907.06(2). The fact that F.R. called the doctor to testify as a witness is immaterial, because § 907.06(1) states, "the witness may be called to testify by the judge or any party." We recognize, as did the trial court, that it may have erred procedurally by not issuing an order clearly appointing Dr. Spierer as the court's expert witness. However, we conclude that any error was harmless. *See* § 805.18, Stats. (court shall "disregard any error or defect in the . . . proceedings which shall not affect the substantial rights of the adverse party.") It is evident from the record that the court appointed Dr. Spierer to conduct psychological examinations to assist it in determining what amount of visitation would be in the best interests of Z.E.R. We therefore conclude that if the trial

MR. BRIGGS: I don't find any order appointing Dr. Spierer as an expert witness. The order which Ms. Newton attaches to her letter is simply an order that Dr. Spierer conduct psychological evaluations.

THE COURT: Well, but the point of that is so that there is information available to the Court. I don't—I didn't draft the order myself, and it was perhaps unartfully drafted. The idea was or the underpinning of this was that this was to be an expert available to provide information to the Court, whether in the form of evaluations or as a witness. I mean if there is—if there is a question about his status as a court-appointed expert, I'd be happy to sign and authorize you to draft or Ms. Newton to draft an order for such an appointment. Clearly that was what was contemplated here, and I think the fact that the order didn't specify that he is entitled to testify should this matter be contested is really a matter of oversight rather than a substantive deficiency in Dr. Spierer's status here. Frankly, it makes no sense to limit an expert's role in a case such as this to only conducting evaluations and not providing information to the Court if that doesn't serve to resolve the case.

655

court erred by ordering T.B. to pay a portion of Dr. Spierer's fees, that error was harmless.

### CONCLUSION

The trial court reached the limits of its discretionary authority in this case, but with the exception of its order that T.B. obtain psychotherapeutic treatment for Z.E.R., we conclude that it did not erroneously exercise its discretion. The evidence shows that Z.E.R. benefits from substantial visitation with his grandmother, and the trial court properly exercised its discretion to create an order that would be in the child's best interests.

*By the Court.*—Orders affirmed in part and reversed in part.